# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

_____
                         :

NICHOLS ET AL. v.             :
SMITHKLINE BEECHAM CORP.   :     Civil Action
                          :     No. 00-6222
_____  :

THIS DOCUMENT RELATES TO   :
ALL ACTIONS                :
_____  :

## END PAYOR CLASS COUNSEL'S MOTION FOR AWARD
## OF ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES

Based upon the facts and authority set forth in the attached Memorandum of Law and
exhibits thereto, Class Counsel hereby respectfully move the Court, pursuant to Rule 23(h) and
Rule 54(d)(2) of the Federal Rules of Civil Procedure, for:  (1) an award to Class Counsel of
attorney fees in the amount of 30% of the $65 million Settlement Fund and accrued interest from
the date of deposit of the funds at the same rate earned by the funds; (2) an award to Class
Counsel for reimbursement of expenses in the amount of $546,480.79 and (3) an award to each

Consumer Class Plaintiff in the amount of $2,500 and each Third Party Payor Class Plaintiff in the amount of $5,000.

Class Counsel incorporate by reference their accompanying Memorandum of Law, as well as the following exhibits thereto, as if fully set forth herein:

- Joint Declaration of Co-Lead Counsel in Support of Their Motion for Final Approval of Settlement and Award of Attorney Fees and Reimbursement of Expenses;

- Declaration of Geoffrey C. Hazard, Jr.;

- Unreported opinions and case materials, including:

    o *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, slip op. (E.D. Pa. Oct. 13, 2004);

    o *In re Buspirone Antitrust Litig.*, MDL No. 1413, Memorandum of Law in Support of Class Counsel's Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs (S.D.N.Y. Oct. 24, 2003);

    o *In re Buspirone Antitrust Litig.*, MDL No. 1413, Order No. 46 (S.D.N.Y. Nov. 14, 2003);

    o *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL Docket No. 1290 (D.D.C. June 16, 2003);

    o *In re Relafen Antitrust Litig.,* Master File No. 01-12239-WGY, Order and Final Judgment (D. Mass. April 9, 2004);

    o *Oncology & Radiation Assocs., P.A. v. Bristol-Myers Squibb Co.,* No. 1:01CV02313, Final Order and Judgment Approving Settlements Between Direct Purchaser Class Plaintiffs and Defendants Bristol-Myers Squibb Company and American Bioscience, Inc. (D.D.C. Aug. 29, 2003);

    o *Ryan-House v. GlaxosmithKline plc.,* No. 2:02cv442, Final Order and Judgment Approving Settlement and Awarding Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs (E.D. Va. Jan.10, 2005); and

    o *Ryan-House v. GlaxoSmithKline, plc.*, No. 2:02cv442, Excerpts from Transcript of Proceedings (E.D. Va. Oct. 28, 2004).

- Reagan W. Silber and Frank E. Goodrich, *Common Funds And Common Problems: Fee Objections And Class Counsel's Response,* 17 Rev. Litig. 525, 546 (1998);

- Master Expense Summary; and

- Compendium of Individual Firm Declarations.


Dated:  February 1, 2005                    Respectfully Submitted:



/s/ *Ellen Meriwether*
**MILLER FAUCHER and CAFFERTY LLP**
Ellen Meriwether, Esquire
One Logan Square
18th & Cherry Streets, Suite 1700
Philadelphia, Pennsylvania 19103
Phone: (215) 864-2800


/s/ *Dianne M. Nast*
**RODA NAST, P.C.**
Dianne M. Nast, Esquire
801 Estelle Drive
Lancaster, Pennsylvania 17601
Phone: (717) 892-3000

/s/ *Kenneth A. Wexler*
**THE WEXLER FIRM, LLP**
Kenneth A. Wexler, Esquire
One North LaSalle Street, Suite 2000
Chicago, Illinois 60602
Phone:  (312) 346-2222

*Co-Lead Counsel for Plaintiffs and the End Payor Settlement Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Hollie M. Schmidt, hereby certify that on February 1, 2005, I caused a true and

correct copy of the foregoing End Payor Class Counsel's Motion for Award of Attorney Fees

and Reimbursement of Expenses and supporting Memorandum of Law, without exhibits, to be

filed electronically, though ECF, with the Clerk of Court and served electronically, through

ECF, on the following counsel for Defendant:

> Joseph Tate, Esquire
> Christine Levin, Esquire
> Dechert LLP
> 4000 Bell Atlantic Tower
> 1717 Arch Street
> Philadelphia, PA 19103

I have also caused the Motion and Memorandum, including all exhibits, to be filed by

hand delivery with the Clerk of Court and served upon the above counsel for Defendant.



> /s/ *Hollie M. Schmidt*
> Hollie M. Schmidt
> Legal Assistant

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____            :
                                            :
NICHOLS ET AL. v.                           :
SMITHKLINE BEECHAM CORP.                    :      Civil Action
                                            :      No. 00-6222
_____            :
                                            :
THIS DOCUMENT RELATES TO                     :
ALL ACTIONS                                 :
                                            :
_____            :

**MEMORANDUM IN SUPPORT OF END PAYOR CLASS COUNSEL'S MOTION**
**FOR AWARD OF ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES**

February 1, 2005

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

Introduction ................................................................................................................... 1

I.  THIS WAS A DIFFICULT AND COMPLEX CASE THAT
    NEEDED TO BE DEVELOPED ALMOST FROM SCRATCH ..................................... 4

II. CLASS COUNSEL ARE ENTITLED TO COMPENSATION BASED
    ON THE BENEFITS CREATED BY THE LITIGATION ................................................ 13

    A.  The Settlement in this Case Creates a Common Fund ........................................... 14

    B.  Courts in the Third Circuit Apply the "Percentage of the Fund"
        Method for Calculating Attorney Fees in Common Fund Cases ........................... 15

        1.  Two elite task forces, convened by the Third Circuit,
            recommend the percentage of the fund method ............................................ 17

        2.  The percentage of the fund method has been universally
            adopted in pharmaceutical antitrust class actions ...................................... 20

    C.  The Percentage Requested is Fair and Reasonable ............................................... 21

        1.  The size of the fund and the number of people benefited ........................... 22

        2.  The presence or absence of objections to terms or fees ............................. 25

        3.  The skill and efficiency of counsel ............................................................ 27

        4.  The complexity and duration of the litigation ............................................ 27

        5.  The risk of nonpayment ............................................................................. 29

            a.  Risk is inherent to the contingent nature of the case .................... 29

            b.  Class Counsel could not build their case upon a prior
                government action ......................................................................... 30

            c.  There were real risks that the class would not be
                certified ......................................................................................... 31

d.      Difficult issues involving the proof of liability added risk..............................................................................................33

6.      The amount of time devoted to the litigation................................................37

7.      The consistency with fee awards in comparable cases .............................38

D.      A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.........41

III.    A MODEST AWARD TO THE CLASS PLAINTIFS IS APPROPRIATE ....................42

IV.     REIMBURSEMENT OF LITIGATION AND SETTLEMENT EXPENSES FROM THE SETTLEMENT FUND IS APPROPRIATE ..................................................43

Conclusion ..................................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Asahi Glass Co., v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp.
2d 986 (N.D. Ill. 2003)........................................................................................6, 12

*Bagel Inn, Inc. v. All Star Dairies,* 1982-1 Trade Cases (CCH)
¶ 64,512, 1981 WL 2185 (D.N.J. Dec. 21, 1981) ........................................................25

*Behrens v. Wometco Enters.,* 118 F.R.D. 534 (S.D. Fla. 1988)....................................24

*Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980)......................................................2, 14

*Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa. 1985)......................................39

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540
(D.N.J. 2000)........................................................................................................35

*Brytus v. Spang & Co.,* 203 F.3d 238 (3d Cir. 2000)..................................................20

*Cagan v. Anchor Sav. Bank FSB*, No. 88-3024, 1990 WL 73423
(E.D.N.Y. May 22, 1990) ......................................................................................24, 25

*California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508
(1972).................................................................................................................34

*Continental Illinois Sec. Litig.,* 962 F.2d 566 (7th Cir. 1992) ......................................40

*Cotton v. Hinton,* 559 F.2d 1326 (5th Cir. 1977)....................................................23, 24

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998)............................36, 37

*Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000)..............................38

*Davies v. Continental Bank,* 122 F.R.D. 475 (E.D. Pa.1988)........................................23

*Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) ................................................24

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)........................................................................................33, 34, 36

*Fisher Bros. v. Cambridge-Lee Indus., Inc.,* 630 F. Supp. 482
(E.D. Pa. 1985)....................................................................................................23

*Fisher Bros. v. Mueller Brass Co.,* 630 F. Supp. 493 (E.D. Pa. 1985)............................24

*Flickering v. C.I. Planning Corp.,* 646 F. Supp. 622 (E.D. Pa. 1986) ...................................14, 15

*FTC v. Mylan Labs., Inc.,* 62 F. Supp. 2d 25 (D.D.C. 1999)...........................................................6

*Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43 (2d Cir. 2000)...................................29, 30

*Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir. 2000)................16, 18, 20, 21, 22, 41

*In re Aetna Inc. Sec. Litig.,* MDL No. 1219, 2001 WL 20928
(E.D. Pa. Jan. 4, 2001) ...............................................................................................................26

*In re Automotive Refinishing Paint Antitrust Litig.,* MDL No. 1426,
slip op. (E.D. Pa. Oct. 13, 2004)............................................................................3, 16, 26, 39

*In re Baan Co. Litig.,* 288 F. Supp. 2d 14 (D.D.C. 2003)............................................................39

*In re Buspirone Antitrust Litig.,* MDL No. 1413, Memorandum of Law
in Support of Class Counsel's Joint Petition for Attorneys' Fees,
Reimbursement of Expenses and Incentive Awards to the Named
Plaintiffs (S.D.N.Y. Oct. 24, 2003).......................................................................................3, 43

*In re Buspirone Antitrust Litig.,* MDL No. 1413, Order No. 46
(S.D.N.Y. Nov. 14, 2003) .......................................................................................................3, 43

*In re Cell Pathways, Inc., Sec. Litig. II,* No. 01-cv-1189, 2002 WL
31528573 (E.D. Pa. Sept. 23, 2002) ..........................................................................................26

*In re Cendant Corp. Litig.,* 264 F.3d 201 (3d Cir. 2001).......................................................21, 40

*In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir. 2001).................15, 16, 17, 19, 20, 42

*In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 852 (W.D. Pa. 1995) .........................................44

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust
Litig.,* 109 F.3d 602 (9th Cir. 1997)............................................................................................38

*In re Copley Pharmaceutical,* 1 F. Supp. 2d 1407 (D. Wyo. 1998) ............................................40

*In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320 (E.D.N.Y. 1993)........................................24, 39

*In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297
(N.D. Ga. 1993) ...........................................................................................................................24

*In re Fidelity/Micron Sec. Litig.,* 167 F.3d 735 (1st Cir. 1999)..................................................44

*In re First Republic Bank Litig.*, No. CA3-88-0641-H (N.D. Tex. Feb. 28, 1992) ........................................................................................39

*In re Four Seasons Sec. Laws Litig.,* 58 F.R.D. 19 (W.D. Okla. 1972)........................................25

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ......................................................20

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ............................................................................................14, 27, 41

*In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ......................................................19, 22, 26, 27, 44

*In re Lloyd's American Trust Fund Litig.,* No. 96 Civ. 1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)......................................26

*In re Lorazepam and Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ....................................................................25, 42, 43

*In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98 (D.C.Cir. 2002) ......................................................................................6

*In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, Memorandum Opinion Re: Settlement (D.D.C. June 16, 2003)........................3, 21, 39

*In re Medical X-Ray Film Antitrust Litig.,* No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ...................................................39

*In re Monosodium Glutamate Antitrust Litig.*, No. 00MDL1328PAM, 2003 WL 297276 (D. Minn. Feb. 6, 2003) .......................................39

*In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329 (N.D. Ga. 2000) ....................................................................29

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................................15

*In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283 (3d Cir. 1998)..................................................17, 20, 41

*In re Relafen Antitrust Litig.*, Master File No. 01-12239-WGY, Order and Final Judgment (D. Mass. April 9, 2004).......................................3, 20

*In re Rite Aid Corp. Sec. Litig.,* No. 03-2914, 2005 WL 159464 (3d Cir. Jan. 26, 2005) ......................................16, 19, 38, 40, 41, 42

*In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) .........................................38

*In re RJR Nabisco, Inc. Sec. Litig.*, MDL No. 818, 1992 WL 210138
(S.D.N.Y. Aug. 24, 1992) ...........................................................................................39, 40

*In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525 (E.D. Pa.
1990) ............................................................................................................................26

*In re Synthroid Marketing Litig.,* 264 F.3d 712 (7th Cir. 2001) ......................................40

*In re U.S. Bioscience Sec. Litig.*, 155 F.R.D. 116 (E.D. Pa. 1994) ..................................39

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002).........................27

*In re Wedtech Litig.*, 138 B.R. 5 (LBS) (S.D.N.Y. July 31, 1992) ....................................39

*In re Workers' Compensation Ins. Antitrust Litig.*, 771 F. Supp. 284
(D. Minn. 1991) ..........................................................................................................39

*Int'l. Woodworkers of Am., AFL-CIO v. Champion Int'l. Corp.,* 790
F.2d 1174 (5th Cir. 1986) ..........................................................................................30

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981)............................................................30

*Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) .........................23, 24

*Lindy Bros. Builders, Inc., of Phila. v. American Radiator & Standard
Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973)..............................................................16

*Lindy Bros. Builders, Inc., of Phila. v. American Radiator & Standard
Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976)..............................................................16

*Missouri v. Jenkins,* 491 U.S. 274 (1989).......................................................................24

*Nichols v. SmithKline Beecham Corp,*, No. 00-6222, 2003 WL 302352
(E.D. Pa. Jan. 29, 2003) ............................................................................................31

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir.
1998) .....................................................................................................................35, 36

*Norton v. Curtiss*, 433 F.2d 779 (Cust. & Pat. App. 1970) ......................................35, 36

*O'Keefe v. Mercedes-Benz USA*, 214 F.R.D. 266 (E.D. Pa. 2003) .................................41

*Oncology & Radiation Assoc. v. Bristol-Myers Squibb Co. and
American Bioscience, Inc.,* Civil Action No. 1:01CV02313, Final
Order and Judgment Approving Settlements Between Direct Purchaser
Class Plaintiffs and Defendants Bristol-Myers Squibb Company and
American Bioscience, Inc. (D.D.C. Aug. 29, 2003) ............................................3, 20, 39

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,
Inc.,*508 U.S. 49 (1993)................................................................................6, 34, 36

*Red Eagle Resources Corp., Inc. v. Baker Hughes, Inc.*, No. H-91-627
(S.D. Tex. 1994).................................................................................................39

*Ryan-House v. GlaxosmithKline plc.,* No. 2:02cv442, Final Order and
Judgment Approving Settlement and Awarding Attorneys' Fees,
Reimbursement of Expenses and Incentive Awards to the Named
Plaintiffs (E.D. Va. Jan.10, 2005) ........................................................................3, 21

*Ryan-House v. GlaxoSmithKline, plc.*, No. 2:02cv442, Transcript of
Proceedings (E.D. Va. Oct. 28, 2004) ...................................................................3, 21

*SmithKline Beecham Corp. v. Apotex Corp.*, 286 F. Supp. 2d 925
(N.D. Ill. 2001)...................................................................................................6

*Stoner v. CBA Information Servs.,* No. 04-00519, 2005 WL 44519
(E.D. Pa. Jan. 7, 2005) .......................................................................................26

*Strang v. JHM Mortgage Sec. Ltd. Partnership*, 890 F. Supp. 499
(E.D. Va. 1995).................................................................................................38

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,*
382 U.S. 172 (1965)...............................................................................33, 34, 35, 36

*Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir. 1982) ...............................................24

<u>RULES AND OTHER AUTHORITY</u>

Federal Rule of Civil Procedure 23 .......................................................... *passim*

Federal Rule of Civil Procedure 30(b)(6) ........................................................9

Federal Rule of Civil Procedure 54(d)(2) ........................................................1

*Court Awarded Attorney Fees*, Report of the Third Circuit Task
Force, October 8, 1985 (Arthur Miller, Reporter), reprinted in 108
F.R.D. 237 (1986) ("*First Task Force Report*").............................................17, 18, 19, 41

MANUAL FOR COMPLEX LITIGATION 4th (Federal Judicial Center 2004) ...............................19, 38

Reagan W. Silber and Frank E. Goodrich, *Common Funds And
Common Problems: Fee Objections And Class Counsel's Response,*
17 Rev. Litig. 525 (1998).........................................................................................3, 39

*Selection of Class Counsel,* Report of the Third Circuit Task Force,
January 15, 2002 (Daniel J. Capra, Reporter), reprinted at
208 F.R.D. 340 (2002) ("*Second Task Force Report*") .........................................18, 19

**MEMORANDUM IN SUPPORT OF END PAYOR CLASS COUNSEL'S MOTION**
**FOR AWARD OF ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES**

**Introduction**

Class Counsel for the End Payor Class respectfully submit this memorandum in support of their request under Rule 23(h) and Rule 54(d)(2) of the Federal Rules of Civil Procedure for an award of attorney fees and reimbursement of expenses from the settlement that they have achieved for the End Payor Class.

Class Counsel are mindful of the heavy responsibility imposed on those who seek attorney fees and the threefold obligations of: (1) their fiduciary duty to members of the class they represent – their clients – whose funds will be charged with the award; (2) candor with the Court, of which they are officers; and (3) support of the judicial process that permits the Rule 23 class suit procedure.

At the same time, Class Counsel must demonstrate to the Court that the fee is appropriate based on their skill, the risks they took, and the awards they obtained for the Class.   Established legal principles hold that counsel who have performed excellent work and produced an excellent result are entitled to compensation for the "market value" of their efforts.  In a capitalist economy, the market value of risk-laden ventures is not defined by "billable time."

As detailed below, the percentage of the fund method is the appropriate method to compensate Class Counsel.  This motion requests an attorney fee award of 30% of the $65 million Settlement Fund ($19.5 million) and accrued interest from the date of deposit of the funds at the same rate earned by the funds.[1]  The amount requested reflects an appropriate

---

[1] A provision of the Settlement requires the class to "give back" a percentage of the settlement fund to Defendant GSK in the event of opt outs.  The amount to be returned to GSK is equal to each opt out's pro-rata share of the settlement fund had it remained in the Class and made a

percentage of the recovery, considering that the standard benchmark range in class actions and percentage awards in other large settlements is 20% to 33%.  The request is also justified under the factors typically identified by courts for consideration in determining a fee award and is lower than the percentage of the recovery that Class Counsel could have obtained at arm's length in the open market.

This is a highly specialized area of the practice of law.  Class Counsel's firms primarily practice contingent class action litigation.  Not every case is successful.  An award of attorney fees based on a fair percentage of the settlement fund is necessary to promote enforcement of the nation's antitrust laws, as well as to compensate counsel for the risk taken and the reward obtained for the Class.

Finally, Class Counsel also request reimbursement of $546,480.79 in out-of-pocket expenses incurred in connection with this litigation, an award of $2,500 to each Consumer Class Plaintiff, and an award of $5,000 to each Third-Party Payor Class Plaintiff.

In support of their motion, Plaintiffs submit as exhibits to this memorandum the following materials, which are presented in two volumes:

Volume I:

- Joint Declaration of Co-Lead Counsel in Support of Their Motion for Final Approval of Settlement and Award of Attorney Fees and Reimbursement of Expenses (attached as Exhibit A);

- Declaration of Geoffrey C. Hazard, Jr. (attached as Exhibit B);

---

claim.  Although the Claims Administrator has received opt-out requests, it is too early to calculate the amount of the give back.  Class Counsel respectfully submit, however, that regardless of this provision it would be appropriate for Counsel's fee award to be based on the entire amount of the settlement fund, because the entire fund was created through Counsel's sole efforts. *See Boeing Co. v. Van Gemert*, 444 U.S. 742 (1980).

- Unreported opinions and case materials, including:

  - *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, slip op. (E.D. Pa. Oct. 13, 2004) (attached as Exhibit C.1);

  - *In re Buspirone Antitrust Litig.*, MDL No. 1413, Memorandum of Law in Support of Class Counsel's Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs (S.D.N.Y. Oct. 24, 2003) (attached as Exhibit C.2);

  - *In re Buspirone Antitrust Litig.*, MDL No. 1413, Order No. 46 (S.D.N.Y. Nov. 14, 2003) (attached as Exhibit C.3);

  - *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL Docket No. 1290 (D.D.C. June 16, 2003) (attached as Exhibit C.4);

  - *In re Relafen Antitrust Litig.,* Master File No. 01-12239-WGY, Order and Final Judgment (D. Mass. April 9, 2004) (attached as Exhibit C.5);

  - *Oncology & Radiation Assocs., P.A. v. Bristol-Myers Squibb Co.,* No. 1:01CV02313, Final Order and Judgment Approving Settlements Between Direct Purchaser Class Plaintiffs and Defendants Bristol-Myers Squibb Company and American Bioscience, Inc. (D.D.C. Aug. 29, 2003) (attached as Exhibit C.6);

  - *Ryan-House v. GlaxosmithKline plc.,* No. 2:02cv442, Final Order and Judgment Approving Settlement and Awarding Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs (E.D. Va. Jan.10, 2005) (attached as Exhibit C.7); and

  - *Ryan-House v. GlaxoSmithKline, plc.*, No. 2:02cv442, Excerpts from Transcript of Proceedings (E.D. Va. Oct. 28, 2004) (attached as Exhibit C.8).

- Reagan W. Silber and Frank E. Goodrich, *Common Funds And Common Problems: Fee Objections And Class Counsel's Response,* 17 Rev. Litig. 525, 546 (1998) (attached as Exhibit D); and

- Master Expense Summary (attached as Exhibit E).

<u>Volume II</u>:

- Compendium of Individual Firm Declarations (separate volume submitted concurrently).

I.    **THIS WAS A DIFFICULT AND COMPLEX CASE THAT NEEDED TO BE DEVELOPED VIRTUALLY FROM SCRATCH.**

Some antitrust cases are harder than others.  Novel questions of law and difficult issues of proof made this case one of the most difficult.

Traditional price-fixing cases are known among the antitrust bar as "hardcore cartel" cases, and call to mind conspiracies formed in smoky rooms, where competitors meet to fix prices.  These cases typically lead to federal antitrust indictments and guilty pleas.  Many private antitrust cases ride the coattails of these federal indictments, making liability easier to prove.

Such was not the case here.  While there was a Federal Trade Commission ("FTC") investigation with regard to Paxil, it was closed without further FTC action.  "Plaintiffs thus had to build their case from the ground up."  Declaration of Geoffrey C. Hazard, Jr. ("Hazard Decl.") ¶ 9 (attached as Exhibit B).

In the hardcore cartel cases, the conspiracy to fix prices is a *per se* violation of the Sherman Act.  The Paxil case is different – it is one of the first cases, if not *the* first case, in the pharmaceutical pricing area to be brought under Section 2 of the Sherman Act.  To the extent that other cases involving patent misuse and manipulation of the Hatch-Waxman procedures had been litigated, they were brought on behalf of indirect purchasers under Section 1, and involved agreements between name brand manufacturers and would-be generic competitors.  Here, there was no smoky room, no FBI video surveillance, no meeting of competitors to fix prices.  This case, involving unilateral action by GSK and a liability theory based on its alleged filing of serial sham litigation, presented significantly more difficult legal issues under the *Noerr-Pennington* doctrine than those present in cases in which a horizontal agreement is reached.

Yet, lacking all the traditional advantages held by plaintiffs in many antitrust cases, Class members' claims against Defendant ("GSK") have been settled for $65 million in cash, plus

accumulated interest (collectively the "Settlement Fund").  Plaintiffs' expert economist has estimated that damages to the Class caused by delay of generic entry in this case range between $466.5 and $693.5 million (although GSK still maintains that there was no delay).  *See* Affidavit of Gary L. French, PhD. ¶ 39 (attached as Exhibit B to the Memorandum in Support of End Payor Plaintiffs' Motion for Final Approval of Settlement and Plan of Distribution).  Plaintiffs' settlement of $65 million represents a recovery between 9.3% and 13.9% of damages.  "This recovery is well within the range of recoveries that other courts have found to be fair and reasonable settlements."  Hazard Decl. ¶ 15.  The amount of the request is also "entirely consistent with the applicable standards for awarding attorneys' fees."  Hazard Decl. ¶ 24.

Such an amount is a commendable result given the difficulty of this case.  The extensive efforts of Class Counsel in achieving this result are summarized below, and are contained in greater detail in the Joint Declaration of Co-Lead Counsel in Support of Their Motion for Final Approval of Settlement and Award of Attorney Fees and Reimbursement of Expenses ("Joint Decl."), attached as Exhibit A.[2]

This significant recovery of damages did not come easily, and the entire effort was fraught with risk.  "The case is a legally and factually very difficult one to frame and to establish the incidence and size of individual injury." Hazard Decl. ¶ 8.  Risk is a fundamental aspect of a contingency case, and this case had even more risk than most other pharmaceutical antitrust cases.  "At the time Plaintiffs began this action, the risk level was very high and remained high throughout."  Hazard Decl. ¶ 9.  These risks included:

---

[2]      Individual declarations of each Class Counsel firm are also submitted concurrently in a separate volume, in further support of Class Counsel's fee request.  Each declaration attests to that individual firm's common benefit time and expenses.

- The difficulties incident to initiating an antitrust case that did not follow upon a governmental action.  Many private antitrust cases arise after a federal investigation has uncovered wrongdoing and the FTC has filed complaints.[3]  Such was not the case here.

- The difficulties of litigating a case under a novel theory of liability, without established precedent.

- The possibility of the Court's applying the test of *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60-61 (1993), which requires a plaintiff to prove that litigation was objectively baseless, since Plaintiffs claimed that GSK unlawfully exercised monopoly power through the institution of sham litigation;

- The implications of Judge Posner's decision in *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc*., 289 F. Supp. 2d 986, 993 (N.D. Ill. 2003), in which he stated that one of the major patent infringement cases filed by GSK was not a sham;[4]

- The need to overcome Judge Kocoras's opinion in favor of GSK in *SmithKline Beecham Corp. v. Apotex Corp.*, 286 F. Supp. 2d 925 (N.D. Ill. 2001), in which he granted GSK's motion for summary judgment on the validity of a key patent protecting Paxil and denied a generic manufacturer's motion for summary judgment on noninfringement;

---

[3]     *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98 (D.C. Cir. 2002) and *FTC v. Mylan Labs., Inc.,* 62 F. Supp. 2d 25 (D.D.C. 1999) (federal antitrust charges regarding Lorazepam and Clorazepate).

[4]     Judge Posner was sitting by designation as a district court judge.

- The difficulties of demonstrating that each patent infringement case brought by GSK was objectively baseless;

- The difficulties of proving fraud on the Patent Office and in Orange Book filings by clear and convincing evidence;

- The possibility of an adverse ruling on GSK's Motion to Strike Plaintiffs' Expert, which addressed, in part, the complicated and unsettled issue of the scope of the *Daubert* standard in the class certification context;

- The uncertainty of this Court's certifying a nationwide class of indirect purchasers; and

- The possibility of GSK's succeeding on dispositive motions.

Time is money. "Counsel spent substantial hours preparing, litigating, and negotiating the settlement in this case." Hazard Decl. ¶ 24.

Time spent litigating one case is time that cannot be spent elsewhere, and this case required an ample investment of time – more than 17,000 hours were spent. The work included:

- retaining and working with economic and patent law experts;

- developing, with assistance from the experts, liability and damages theories;

- analyzing complex issues of antitrust law and the Hatch-Waxman Act;

- tracking and analyzing the developments in more than twenty patent litigations regarding Paxil to determine their impact on this case;

- examining hundreds of thousands of pages of discovery, including complex patent documents;

- researching and preparing extensive briefs on class certification and in response to multiple GSK motions, including GSK's Motion to Stay the Proceedings and GSK's Motion to Strike Plaintiff's Expert;

- participating in oral argument before the court on those issues;

- analyzing generic entry issues; and

- participating in numerous and complicated settlement discussions with defense counsel.

The Class Plaintiffs, along with Class Counsel, accepted the immense risk of litigating this contingent class action. In accepting this fiduciary responsibility to absent Class members, Class Counsel also invested more than $546,480.79 in out-of-pocket expenses,[5] with no guarantee of return, to retain some of the nation's leading experts in economics and patents and to cover other litigation expenses.

The first complaint in this action, the *Nichols* Complaint, was filed on December 8, 2000, followed shortly by additional complaints. Joint Decl. ¶ 2. Prior to filing the Complaint, Counsel engaged in extensive pre-filing investigation, including research into the FTC investigation of GSK's "Orange Book" listing practices and analysis of the Paxil patent litigation pending in the Northern District of Illinois and the Eastern District of Pennsylvania. Joint Decl. ¶ 1. An extensive amount of time early in this case was spent opposing GSK's motion to stay these proceedings pending the outcome of those patent cases, requiring comprehensive analysis and briefing of issues relating to the effect of the patent cases on the civil action. Joint Decl. ¶ 4.

The *Nichols* Complaint was consolidated with two other complaints by the filing of a Consolidated Amended Complaint in May 2001. Joint Decl. ¶ 6. The case then proceeded into

---

[5]     A master expense summary is attached hereto as Exhibit E.

the class certification phase, bringing its own challenges.  Because this is an indirect purchaser

case, the preparation of Plaintiffs' Counsel's opening brief on class certification required a

thorough discussion of the applicability of the laws of the many states.  Joint Decl. ¶ 10.

Extensive legal research was undertaken to determine the current status of these laws, the courts'

construction of them, and any state legislative action that could impact the claims.  *Id.*  In

addition, Plaintiffs engaged the economic consulting firm of Nathan Associates to evaluate and

prepare a statement on the ability of Plaintiffs to prove impact and damages on a class-wide

basis, a prerequisite for class certification in an antitrust case.  Joint Decl. ¶ 11.

Class certification discovery followed, and Plaintiffs' counsel worked with each of the

named Plaintiffs to obtain responsive documents, answer interrogatories, and prepare for and

attend their depositions.  Joint Decl. ¶¶ 12, 22.  Plaintiffs reviewed and indexed approximately

15 boxes of documents produced by GSK, in addition to non-party discovery from entities such

as NPA and Express Scripts, and took the Rule 30(b)(6) deposition of GSK's designee, Vice

President of Marketing Bonnie Rossello.  Joint Decl. ¶¶ 19-21.  Expert depositions and

preparation of Plaintiffs' rebuttal expert report required extensive work.  Joint Decl. ¶¶ 23-25.

Additionally, Plaintiffs' Counsel prepared and filed opposition papers to GSK's motion to strike

the testimony of Plaintiffs' expert, Dr. Gary French.  Joint Decl. ¶¶ 24-26.  After extensive

briefing, that motion was denied and an evidentiary hearing on class certification was held in

February 2003.  Joint Decl. ¶¶ 26-27.

Settlement negotiations in this case began around the time of the hearing on Class

Certification.  Joint Decl. ¶ 29.  These arm's length discussions were serious, but the parties

remained very far apart.  The parties requested that the case be moved to the suspense docket in

March 2003, to allow the negotiations to continue while maintaining the *status quo*.  *Id.*  The

parties, however, could not agree on a resolution and progress in the negotiations was slow. Joint Decl. ¶ 30. At the conclusion of the summer of 2003, Plaintiffs' Counsel determined that it was in the Class' best interests to request that the case be returned to the active docket. *Id*.

Around the same time that settlement negotiations stalled, two additional complaints were filed. Joint Decl. ¶ 31. In August 2003, direct purchaser Stop & Shop filed a direct purchaser antitrust class complaint. *Id.* After nearly three years of litigating on behalf of the indirect purchaser class, Plaintiffs' Counsel began to coordinate efforts with counsel in the *Stop & Shop* case. *Id.* In addition, on October 8, 2003, another indirect purchaser complaint was filed by named plaintiffs the County of Suffolk, John Kelly and Olivia Haeberger. Joint Decl. ¶ 32. That case was consolidated with the *Nichols* case, requiring supplemental briefing on class certification because of a modified class definition and the additional claims based upon GSK's marketing practices. *Id.*

While this activity was ongoing, the underlying patent litigation also continued. The history of the Paxil patent litigation is sprawling, extending over five years and involving no fewer than twenty GSK-initiated patent infringement litigations over claims concerning seven different patents. The sheer volume of cases brought and patents litigated makes any summary of the litigation necessarily cursory.

GSK brought the first of this battery of cases on June 26, 1998 against Apotex for allegedly infringing the 4,721,723 patent ("'723 patent"). Within thirteen months, GSK filed another suit against Apotex alleging infringement of the 5,900,423 patent ("'423 patent") and a suit against Geneva alleging infringement of the '723 patent, the '423 patent, and the 5,872,132 patent ("'132 patent").

In 2000, GSK brought seven more lawsuits against generic pharmaceutical companies: two against Zenith alleging infringement of the '723, '423, and '132 patents in one, and the 6,080,759 patent ("'759 patent") and the 6,113,944 patent ("'944 patent") in the other; two against Pentech alleging infringement of the '723 and '132 patents in one, and the '759 patent in the other; one against Synthon alleging infringement of the '723 patent and the 6,063,927 patent ("'927 patent"); one against Geneva alleging infringement of the '759 and '944 patents; and yet another against Apotex alleging the infringement of the '759 patent.

In 2001, GSK filed seven complaints:  another two against Apotex, alleging infringement of the '944 patent and the 6,172,233 patent ("'233 patent"); two against Alphapharm alleging infringement of the '132, '423, '723, and '759 patents in one, and the '944 patent in the other; another against Zenith, alleging infringement of the '233 patent; one against Andrx alleging infringement of the '723, '132, and '759 patents, and one against Endo alleging infringement of the '723, '132, '423, '759, and '944 patents.  As 2001 closed, thirteen of these cases were consolidated for pre-trial purposes.

Over the next two years, GSK filed three more lawsuits:  one against Geneva alleging infringement of the '233 patent, one against Alphapharm also alleging infringement of the '233 patent, and one against Teva alleging infringement of the '723 patent.  The three lawsuits from 2002 and 2003 were consolidated into the thirteen-case block created in late 2001.  Five of these actions are still active as of February 1, 2005 while the remaining cases are either stayed or closed.

Every event in each of these numerous actions required analysis by Class Counsel to determine if the event further complicated the already tangled multiple actions, or would

negatively affect either this litigation or the parties' settlement posture.  In particular, several significant events required extensive analysis:

- Judge Posner's construction of the '723 patent and finding that it was valid but not infringed by Apotex's anhydrate form of paroxetine;

- The Federal Circuit's affirmance of Judge Posner's decision finding in favor of Apotex, but on a wholly different basis than that given by Judge Posner, *i.e.*, that Claim 1 of the '723 patent was invalid because of "prior use;"

- The FDA's publication of new regulations taking the position that the Hatch-Waxman Act allowed only one 30-month stay per ANDA;

- GSK's request to the FDA to delist three of its patents – '927, '759, and '233; and

- Dicta in Judge Posner's opinion in *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 992 (N.D. Ill. 2003) that there was "nothing to suggest that [GSK's] claim of infringement [in the *Apotex* litigation] was frivolous."

Each of these developments and others had the potential to impact this litigation and the parties' settlement posture and therefore required careful attention and analysis.  Joint Decl. ¶ 35.

This Court's December 1, 2003 Case Management Order permitted merits discovery to begin in January 2004.  Joint Decl. ¶ 33.  Class Counsel prepared for this by creating a "cast of characters" and a list of potential deponents from the class certification discovery documents, drafting jury instructions to assist in refining the document coding protocol, and preparing discovery requests and notices of deposition.  Joint Decl. ¶ 36.  Over the next few months, GSK produced 69 CD-roms containing more than 800,000 pages of documents that were reviewed in Boston and Chicago by teams of lawyers pursuant to a joint document review protocol formulated with counsel for the direct purchasers.  Joint Decl. ¶¶ 38-40.  Plaintiffs' Counsel also

responded to interrogatories, produced documents, and prepared and defended depositions of the named plaintiffs added by the *County of Suffolk* complaint.  Joint Decl. ¶ 37.

During late spring and into the summer of 2004, the parties renewed their settlement discussions.  Joint Decl. ¶ 47-48.  After these lengthy negotiations and following substantial discovery, Class Counsel entered into a settlement agreement with GSK on October 1, 2004.  Joint Decl. ¶ 53.  This process also involved intense work to prepare the preliminary approval papers, devise a notice plan and plan of distribution, prepare notice materials, draft the escrow arrangement and agreement, and select the Claims Administrator.  Joint Decl. ¶¶ 51-52.  The Court granted preliminary approval to the settlement on October 18, 2004.  Joint Decl. ¶ 53.  Since that time, Class Counsel have continued to work on claims issues, prepare the materials necessary for consideration of final approval, coordinate with the Claims Administrator and respond to Class members' inquiries.  Joint Decl. ¶¶ 54, 60.

At the end of the day, the risk assumed by the Class Plaintiffs and Class Counsel paid handsome benefits for absent Class members – a $65 million settlement.

## II.   CLASS COUNSEL ARE ENTITLED TO COMPENSATION BASED ON THE BENEFITS CREATED BY THE LITIGATION.

Class Counsel are entitled to compensation based upon the benefits created for the Class and respectfully request that this Court award attorney fees in the amount of 30% of the $65 million Settlement Fund and accrued interest from the date of deposit of the funds at the same rate earned by the funds, and authorize reimbursement of Counsel's costs and litigation expenses.  The amount requested is reasonable in light of the risks accepted by Counsel, the work performed, and the result achieved, and is consistent with benchmarks from this Circuit and other courts around the nation.

A.       **The Settlement in this Case Creates a Common Fund.**

For more than a century, the Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  *See also In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) ("[T]here is no doubt that attorneys may properly be given a portion of the Settlement Fund in recognition of the benefit they have bestowed on class members.").  Beyond providing just compensation, awards of attorney fees from a common fund also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on an entire class of persons, thereby discouraging future misconduct of a similar nature.

When considering a fee request in this type of case, "[i]t is important to consider that, in this country's legal system, enforcement of commercial regulation, such as the antitrust laws, is accomplished to a large extent by private initiative of private claimants and lawyers in independent practice."  Hazard Decl. ¶ 29.   By contrast, "[i]n most legal systems this initiative is very largely in the hands of government officials and agencies.   The system of enforcement through private litigation is sustained by awards of fees sufficient to allow lawyers in private practice to undertake the risks."  Hazard Decl. ¶ 29.

The common fund doctrine is based upon the inherent equitable powers of the federal courts to "prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing,* 444 U.S. at 478.   A key difference between a common fund case and one in which fees are assessed pursuant to a statute is that, in a common fund case, "the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby

14

avoiding the unjust enrichment of those who otherwise would be benefited by the fund without

sharing in the expenses incurred by the successful litigant." *Flickering v. C.I. Planning Corp.,*

646 F. Supp. 622, 632 (E.D. Pa. 1986).

In this case, Class Counsel have negotiated a settlement that will create a common fund

of $65 million, plus accrued interest and less fees and expenses, for the benefit of the End Payor

Plaintiff Class.  In recognition of their skill and labor and the extraordinary result achieved for

the Class, and to prevent so-called unjust enrichment of absent plaintiffs who have received the

benefit of Class Counsel's work, Class Counsel request an award of attorney fees and expenses

from the Settlement Fund pursuant to the "Percentage of the Fund" Method.

**B.** **Courts in the Third Circuit Apply the "Percentage of the Fund"**
**Method for Calculating Attorney Fees in Common Fund Cases.**

While the entitlement to a common benefit fee from the proceeds of a class settlement

has been clear for over a century, the methodology for determining the amount of the award

continues to be analyzed extensively by courts and commentators alike.  While all courts have

agreed with the proposition that the fee should be a "reasonable" one determined by the district

court in the exercise of informed discretion, they have sometimes differed as to the method used

to calculate that reasonable fee.  *See, e.g., In re NASDAQ Market-Makers Antitrust Litig.*, 187

F.R.D. 465, 483 (S.D.N.Y. 1998).

As the Third Circuit explained in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d

Cir. 2001), there are two primary methods for calculating attorney fees:  the percentage-of-

recovery method, also known as the percentage of the fund method, and the lodestar method.[6]

---

[6]     The percentage fee approach is exactly what its name implies – attorney fees are set at a
percentage of the fund, commonly between 20% and 33% of the fund.  *See* Section II.C.7, below.
The fee awarded to counsel is measured by the benefit conferred upon the class.  In other words,

*Id.* at 732.  *See also In re Rite Aid Corp. Sec. Litig.,* No. 03-2914, 2005 WL 159464, at *4 (3d

Cir. Jan. 26, 2005).  The percentage of the fund method "resembles a contingent fee in that it

awards counsel a variable percentage of the amount recovered for the class."  *In re Automotive*

*Refinishing Paint Antitrust Litig.*, MDL No. 1426, slip op. at 5 (E.D. Pa. Oct. 13, 2004), attached

as Exhibit C.1, *quoting Cendant Corp. PRIDES*, 243 F.3d at 732 n.10.   It "is generally favored

in cases involving a common fund, and is designed to allow courts to award fees from the fund in

a manner that rewards counsel for the successes and penalizes it for failure" by aligning

counsel's interests with those of the class.  *Cendant Corp. PRIDES,* 243 F.3d at 732 (internal

quotation and citation omitted).  *See also Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195

n.1 (3d Cir. 2000); Hazard Decl. ¶ 23.

        In contrast, the lodestar method involves "[a] court determin[ing] an attorney's lodestar

award by multiplying the number of hours he or she reasonably worked on a client's case by a

reasonable hourly billing rate for such services given the geographical area, the nature of the

services provided, and the experience of the lawyer."  *Gunter*, 223 F.3d at 195 n.1.  The court

may then apply a "multiplier," which is intended to provide compensation for the economic risks

that counsel took in prosecuting the litigation without any guarantee of payment.  *See, e.g., Lindy*

*Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161,

168 (3d Cir. 1973); *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard*

*Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976).  "The lodestar method is more commonly

applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially

beneficial litigation in cases where the expected relief has a small enough monetary value that a

---

the percentage method does not depend on counsel's hourly rates or billable hours; it is instead
based on a percentage of the common fund.

percentage-of-recovery method would provide inadequate compensation." *Cendant Corp. PRIDES*, 243 F.3d at 732, *quoting In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998).

### 1. Two elite task forces, convened by the Third Circuit, recommend the percentage of the fund method.

The Third Circuit adopted the percentage of the fund method as the favored means of awarding counsel fees in common fund cases following the recommendations of a task force it established in 1984 to study the issue of fee awards in class action cases. *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, October 8, 1985 (Arthur Miller, Reporter), reprinted in 108 F.R.D. 241, 246-249 (1986) (hereinafter "*First Task Force Report*") (noting that fee awards in common fund cases have historically been computed based upon a percentage of the fund and that the use of the lodestar method results in a wide range of inequities in common fund matters).

The First Task Force, made up of a panel of judges, distinguished academicians, and counsel, was convened because of perceived problems with the lodestar method of calculating fees, including:

- Application of the lodestar increases the workload of an overtaxed judicial system and diverts resources from other, perhaps more important, judicial duties;

- The lodestar factors are insufficiently objective, leading to a loss of predictability and loss of confidence in the fee-setting procedure;

- The sense of mathematical precision fostered by the lodestar process is unwarranted in terms of the realities of the practice of law;

- The lodestar method is subject to manipulation by judges who have a target fee amount in mind;

- The lodestar method encourages certain abuses, including billing for unjustified, excessive, or duplicative work and inflation of the "normal" billing rate;

- Because lodestar fees are awarded based upon the hours worked, a disincentive for the early settlement of cases is created;

- The lodestar method does not permit courts the flexibility to craft fee awards to reward or deter lawyers so that desirable objectives will be fostered; and

- While the lodestar formula appears simple, it leaves many areas for (often inconsistent) interpretation.

*First Task Force Report,* 108 F.R.D. at 246-49.

The First Task Force concluded that fee awards in traditional common fund cases should be based on a percentage of recovery.  *Id.* at 254-59.  *See also* Hazard Decl. ¶ 20.

The Third Circuit embraced the First Task Force's conclusions.  *See Selection of Class Counsel,* Report of the Third Circuit Task Force, January 15, 2002 (Daniel J. Capra, Reporter), reprinted at 208 F.R.D. 340, 421 (2002) (hereinafter "*Second Task Force Report*") ("The Third Circuit, following the recommendations of the First Task Force, has favored the use of the percentage of the fund method of common fund cases."). [7]  *See also Gunter*, 223 F.3d at 195, *citing extensively to the First Task Force Report.*

Then-Chief Judge Becker of the Third Circuit convened the Second Task Force, which dealt primarily with the selection of class counsel, but also examined fee awards and reevaluated the recommendations made by the 1985 Task Force.  Seventeen years after the 1985 Task Force's report, in 2002, the Task Force on the Selection of Class Counsel reported its

---

[7]    The report is also available on the Third Circuit's website at http://www.ca3.uscourts.gov.  The Second Task Force was composed of judges, academics, and practicing attorneys, including Co-Lead Counsel for the End Payor Class, Dianne M. Nast.

agreement with the 1985 Task Force, concluding that "[e]xperienced practitioners know that a highly qualified and dedicated attorney may do more for a class in one hour than another attorney could do in ten." *Second Task Force Report,* 208 F.R.D. at 422.

Additionally, the Second Task Force concluded, "[t]he lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the class." *Id*. The lodestar method has also been criticized because it "[u]ndercompensates attorneys who take on complex or novel cases on a contingency fee basis." Hazard Decl. ¶ 21. In fact, the Second Task Force was "highly skeptical about the use of the lodestar even as a cross-check when awarding a percentage of the common fund." *Second Task Force Report,* 208 F.R.D. at 422. *See also* Hazard Decl. ¶¶ 21-22.

After more than a decade of experimenting with the burdensome lodestar method, courts around the nation eschew the lodestar method, returning to the percentage of recovery method, because it both conserves judicial resources and better serves the goals of awarding attorney fees in common fund cases. *See* MANUAL FOR COMPLEX LITIGATION 4th § 14.121, at 187 (Federal Judicial Center, 2004) (noting that "the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases").

The Third Circuit has, in fact, led the return to the percentage of recovery method for calculating fees in common fund cases. *See First Task Force Report*; *Second Task Force Report*; *In re Rite Aid,* 2005 WL 159464, at *4 ("The percentage-of-recovery method is generally favored in common fund cases."); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *3 (E.D. Pa. June 2, 2004) ("This is a common fund case. Therefore, the percentage of recovery method is the proper one to calculate attorneys' fees."); *Cendant Corp. PRIDES,* 243 F.3d at 732 ("The percentage-of-recovery method is generally favored in cases involving a

common fund."); *Gunter,* 223 F.3d at 195 n.1 (3d Cir. 2000); *Brytus v. Spang & Co.,* 203 F.3d

238, 243 (3d Cir. 2000); *In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d

283, 333-34 (3d Cir. 1998); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.*

*Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("Courts use the percentage of recovery method in

common fund cases on the theory that the class would be unjustly enriched if it did not

compensate the counsel responsible for generating the valuable fund bestowed on the class.").

*See also* Hazard Decl. ¶ 23.

> **2.    The percentage of the fund method has been universally adopted in pharmaceutical antitrust class actions.**

Consistently, and without exception, district courts throughout the country have applied

the percentage of the fund method in calculating attorney fees in pharmaceutical antitrust class

action settlements.  These cases include:

- *In re Relafen Antitrust Litig.*[8] The Court stated that "use of the percentage of fund method in common fund cases is the 'prevailing praxis' in this Circuit for awarding attorney fees and permits the Court to focus on a showing that the fund conferring a benefit on the class resulted form the lawyers' efforts."  The Court awarded 33 1/3% of the $175 million settlement fund in fees.

- *Taxol Antitrust Litig.*[9]  The Court awarded class counsel the requested 30% of the direct purchaser $65.8 million Settlement Fund as attorney fees.

---

[8]    *In re Relafen Antitrust Litig.,* Master File No. 01-12239-WGY, Order and Final Judgment (D. Mass. April 9, 2004) (attached as Exhibit C.5).

[9]    *Oncology & Radiation Assocs., P.A. v. Bristol-Myers Squibb Co.,* No. 1:01CV02313, Final Order and Judgment Approving Settlements Between Direct Purchaser Class Plaintiffs and Defendants Bristol-Myers Squibb Company and American Bioscience, Inc. (D.D.C. Aug. 29, 2003) (attached as Exhibit C.6).

- *In re Lorazepam & Clorazepate Antitrust Litig.*[10]  The Court applied a percentage of the fund approach and awarded 30% of the $35 million settlement fund in fees.

- *Augmentin Antitrust Litig.*[11]  The Court awarded class counsel 25% of the $29 million indirect purchaser settlement fund as attorney fees.  The Court, recognizing the experience of class counsel and the difficulty in prosecuting the case, was "persuaded as to the reasonableness of the fee and expense reimbursement sought."[12]

As demonstrated by these opinions and orders from district courts throughout the country in similar antitrust litigation, the courts demonstrably favor the percentage of the fund approach.

### C.    The Percentage Requested is Fair and Reasonable.

"Under the percentage-of-recovery approach, a court charged with determining whether a particular fee is 'reasonable' first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001).  In making that decision, the Third Circuit has directed district courts to consider the seven factors set forth in *Gunter v. Ridgewood Energy Corp.*:

(1)     the size of the fund created and the number of persons benefited;

---

[10]     MDL No. 1290, Memorandum Opinion Re: Settlement at 3, 16-17 (D.D.C. June 16, 2003) (attached as Exhibit C.4).

[11]     *Ryan-House v. GlaxosmithKline plc.,* No. 2:02cv442, Final Order and Judgment Approving Settlement and Awarding Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs  (E.D. Va. Jan.10, 2005) (attached as Exhibit C.7).

[12]     *Ryan-House v. GlaxoSmithKline, plc.*, No. 2:02cv442, Transcript of Proceedings, at 89 (E.D. Va. Oct. 28, 2004) (attached as Exhibit C.8).

(2)     the presence or absence of substantial objections by members of the class to the

        settlement terms and/or the fees requested by counsel;

(3)     the skill and efficiency of the attorneys involved;

(4)     the complexity and duration of the litigation;

(5)     the risk of nonpayment;

(6)     the amount of time devoted to the case by plaintiffs' counsel; and

(7)     the awards in similar cases.

*Gunter*, 223 F.3d at 195 n.1.  *See also In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004

WL 1221350, at *4 (E.D. Pa. June 2, 2004); Hazard Decl. ¶¶ 14, 23-24.

> **1.     The size of the fund and the number of people benefited.**

The settlement in this case is very favorable to the Class.  *See* Hazard Decl. ¶ 24.

Pursuant to the proposed Settlement, the Class will obtain an immediate and certain benefit of

$65 million in cash, plus accrued interest, less attorney fees, expenses and Class Plaintiff

payments as awarded by the Court.

A large number of persons will benefit from this settlement.  The Class is estimated to

contain many thousands of members, including all persons or entities in the United States who

purchased Paxil or its generic alternatives for consumption by themselves, their families,

members, employees, insureds, participants, or beneficiaries over a period of more than six

years.[13]  These Class members are assured of a cash recovery without the expense and burden of

---

[13]     Excluded from the class are governmental entities (except to the extent that the
governmental entity makes prescription drug purchases as a part of a health benefit plan for its
employees); Defendants and their officers, directors, management, employees, subsidiaries, and
affiliates; persons or entities who purchased Paxil or its generic alternatives for purposes of
resale; any person or entity whose only purchase(s) of Paxil were made directly from Defendants
or their affiliates and/or whose purchases of generic paroxetine were made directly from the
manufacturer thereof.

proof involved in duplicative and expensive individual trials.  This is no small feat, because

Class Counsel built this case from the ground up on a novel theory of liability without the benefit

of a government case laying the groundwork.  Hazard Decl. ¶ 28 ("[I]t should be recognized that

the legal and factual theories presented by Plaintiffs' counsel represented a high degree of

professional creativity. These concepts included reliance on state anti-trust statutes, consumer

protection provisions, and the state common law rules of unjust enrichment.  These theories have

an established provenance, giving them plausibility, but [h]ad not been used in the context of

monopolization claims.").

     In addition to its size in dollars, the recovery that Class members will obtain from the

settlement falls within a range of reasonableness in comparison to the potential damages.

According to an analysis performed by Plaintiffs' expert, the $65 million settlement recovers

between 9.3% and 13.9% of the damages in this case, depending on which of the three dates is

used on which Plaintiffs allege generic paroxetine could have entered the market.  *See* Affidavit

of Gary L. French, PhD. ¶¶ 23, 39 (attached as Exhibit B to the Memorandum in Support of End

Payor Plaintiffs' Motion for Final Approval of Settlement and Plan of Distribution).  "This

recovery is well within the range of recoveries that other courts have found to be fair and

reasonable settlements."  Hazard Decl. ¶ 15.

     In evaluating a proposed settlement, the Court must determine whether the recovery falls

within that range of reasonableness, "not whether it is the most favorable possible result of

litigation."  *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 338-39 (W.D. Pa. 1997), *quoting*

*Fisher Bros. v. Cambridge-Lee Indus., Inc.,* 630 F. Supp. 482, 489 (E.D. Pa. 1985).  *See also*

*Davies v. Continental Bank,* 122 F.R.D. 475, 480 (E.D. Pa.1988).  As the Fifth Circuit has

explained, "[C]ompromise is the essence of a settlement. . . . [I]nherent in compromise is a

yielding of absolutes and abandoning of highest hopes." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977) (internal quotation and citation omitted).

In *Lazy Oil Co. v. Wotco Corp.*, the plaintiffs had estimated damages to be $271 million during the entire class period, 95 F. Supp. 2d at 314, but the court noted that the settlement, which was valued at approximately $14.5 million and 5.35% of the total potential damages, was reasonable, given the difficulties of proof in the case. *Id. See also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement of between 12.7% to 15.3% of the estimated damages); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 323-24 (E.D.N.Y. 1993) (approving settlement for approximately 10% of potential recovery).

In *Detroit v. Grinnell Corp.,* the Second Circuit stated: "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." 495 F.2d 448, 455 (2d Cir. 1974), *impliedly overruled in non-relevant part by Missouri v. Jenkins,* 491 U.S. 274 (1989). And, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2.

As a result, class settlements involving far smaller percentage recoveries have been approved. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 65 (2d Cir. 1982) ($2.84 million settlement of action involving losses estimated at $250 million and $1 billion upheld, even though it amounted to "only a negligible percentage of the losses suffered by the class," because it involved legal difficulties); *Fisher Bros. v. Mueller Brass Co.,* 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving settlement of 0.2% of sales); *Behrens v. Wometco Enters.,* 118 F.R.D. 534, 542 (S.D. Fla. 1988) (settlement of 5.7% of total damages); *Cagan v. Anchor Sav. Bank FSB*, No. 88-

3024, 1990 WL 73423 (E.D.N.Y. May 22, 1990) (settlement of $2.3 million where estimated

damages were $121 million); *In re Four Seasons Sec. Laws Litig.,* 58 F.R.D. 19, 36-37 (W.D.

Okla. 1972) (settlement of less than 8% of estimated damages); *Bagel Inn, Inc. v. All Star*

*Dairies,* 1982-1 Trade Cases (CCH) ¶ 64,512, 1981 WL 2185, at *3 (D.N.J. Dec. 21, 1981)

(settlement of 8% of potential damages).

Comparing this Settlement with those achieved in other recent pharmaceutical antitrust

class actions further supports the reasonableness of this Settlement.  For example, in *In re*

*Lorazepam and Clorazepate Litigation,* the court found that when the settlement amount for the

Third Party Payor Class represented between 15% and 33% of the best possible recovery, it was

reasonable under the circumstances, given the significant hurdles to litigating the case to a

successful conclusion.  *In re Lorazepam and Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 394-

95 (D.D.C. 2002).

In this case, the maximum percentage recovery falls within the approximate ranges of the

recoveries in similar indirect purchaser suits.

### 2.    The presence or absence of objections to terms or fees.

The detailed Class Notice, which was sent to respondents through the broad direct

mailing and publication plan in this case, informed Class Members that Class Counsel would

seek fees not exceeding 30% of the settlement fund and expenses, plus awards to the class

representatives.

Additionally, the Notice expressly advised Class Members that they could object to the

fee application.  To date, no objections to the settlement or the attorney fees have been received,

although the deadline for Class Members to file objections is not until February 15, 2005.

Generally, however, the absence of substantial objections to settlement terms or fee requests

supports the fairness of a fee award. *See, e.g., In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, slip op. at 11-12 (E.D. Pa. Oct. 13, 2004) (stating that, when nearly 60,000 notices were sent and three objections were received, the vast majority of the Class members had no objection, which counseled in favor of a 32% fee award), attached as Exhibit C.1; *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *5 ("The absence of objections supports approval of the Fee Petition."); *In re Cell Pathways, Inc., Sec. Litig. II*, No. 01-cv-1189, 2002 WL 31528573, at *9 (E.D. Pa. Sept. 23, 2002) (noting that existence of only one objection shows that class does not object to attorney fees and approves fee petition); *In re Aetna Inc. Sec. Litig.*, No. Civ. A. MDL 1219, 2001 WL 20928, at *15 (E.D. Pa. Jan. 4, 2001) ("[T]he Class members' view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award."); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990). *See also* Hazard Decl. ¶ 24.

Even the presence of objections, however, does not necessarily mean that the requested fee should be reduced. *See, e.g., In re Lloyd's American Trust Fund Litig.,* No. 96 Civ. 1262 RWS, 2002 WL 31663577, at **3, 28 (S.D.N.Y. Nov. 26, 2002) (approving fee request of 28% of settlement fund, even though 18% of class members filed objections to settlement on one or more grounds). It is possible, for example, that upon consideration the Court might find such objections lacking in merit. *Stoner v. CBA Information Servs.,* No. 04-00519, 2005 WL 44519, at *2 n.1 (E.D. Pa. Jan. 7, 2005).

Class Counsel will provide an update to the Court on the number of objections received, if any, after the February 15, 2005 objection deadline.

3.      **The skill and efficiency of counsel.**

Class Counsel's practices emphasize complex antitrust class actions.[14]  Their firms are

several of a limited number of antitrust firms around the country "[w]illing to take cases in the

emerging and extremely difficult arena of Sherman Act violations involving fraud on the Patent

Office."  Hazard Decl. ¶ 24.  Their skill in this field is clearly reflected in the settlement achieved

for the Class.  *See In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *5 ("The size of the

settlements . . . evidences a high level of skill by petitioners."); *In re Warfarin Sodium Antitrust*

*Litig.*, 212 F.R.D. 231, 261 (D. Del. 2002) (Class counsel "showed their effectiveness . . .

through the favorable cash settlements they were able to obtain.").  *See also In re Ikon*, 194

F.R.D. at 194 ("The most significant factor in this case is the quality of representation, as

measured by the 'quality of the result achieved, the difficulties faced, the speed and efficacy of

the recovery, the standing, experience and expertise of counsel, the skill and professionalism

with which counsel prosecuted the case and the performance and quality of opposing counsel.'")

(citation omitted); Hazard Decl. ¶ 24.

4.      **The complexity and duration of the litigation.**

The complexity and duration of this litigation weigh in favor of the requested fee award.

Hazard Decl. ¶ 24.  Filed in December 2000, it took nearly four years of vigorous litigation to

reach the point of settlement.  Class Counsel, pooling their efforts, began an extensive

investigation into the several patent litigations that had been filed by GSK.  Joint Decl. ¶ 1.  The

investigation included collecting and reviewing public documents from the litigations, conferring

with Apotex's counsel, drawing on their experiences from other generic drug suppression cases

---

[14]     Class Counsel respectfully refer the Court to the Joint Declaration, attached as Exhibit A, and the individual firms' declarations, which have been filed concurrently, as Volume II to Counsel's Motion.

in which they were involved, and conducting legal research on potential theories of a case.  *Id.*
Class Counsel filed the *Nichols* Complaint on December 8, 2000.  Joint Decl. ¶ 2.  The *Nichols*
Complaint was followed shortly thereafter by additional complaints that were ultimately
consolidated with *Nichols.* Joint Decl. ¶ 2.

Counsel worked extensively with Nathan Associates economist Dr. Gary French to
analyze the economic impact of the alleged activities of GSK and vehicles of common proof.
Joint Decl. ¶ 11.  Plaintiffs' opening class certification brief, along with Dr. French's first
declaration, was filed on October 4, 2001.  *Id.*  Class certification discovery then began in
earnest.  Joint Decl. ¶ 12.  GSK vigorously opposed certification.  Joint Decl. ¶¶ 13-15, 18, 24.
Class Counsel ultimately took several depositions and prepared and defended the named
plaintiffs and class certification expert during their depositions by GSK.  Joint Decl. ¶¶ 22-23.
Merits discovery began on January 10, 2004, and the Court set aggressive dates for the
completion of fact discovery, expert discovery, the filing of dispositive motions, and for the final
pretrial conference.  Joint Decl. ¶ 36.  Defendant produced hundreds of thousands of pages of
documents that were analyzed by Class Counsel.  Joint Decl. ¶¶ 39-40.

In the summer of 2004, the ongoing settlement negotiations finally bore fruit.  Joint Decl.
¶¶ 47-48.  In mid-July, having negotiated with Plaintiffs' Co-Lead Counsel since early 2003,
GSK responded to a demand made on behalf of the indirect purchasers with a number that, in the
view of Lead Counsel, made it reasonably likely that an agreement would be reached.  Joint
Decl. ¶ 48.  The parties advised the Court that significant progress was being made and requested
a short postponement of the second class certification hearing to September 1, 2004.  *Id.*  In mid-
August, Co-Lead Counsel and GSK agreed to a settlement in the aggregate of $65 million.  Joint
Decl. ¶ 50.

As to the complexity of the case, "[a]n antitrust class action is arguably the most complex class action to prosecute." *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000). "The legal and factual issues involved are always numerous and uncertain in outcome." *Id.* This case is more complex than most, involving a Section 2 monopoly claim, end payor claims under a multitude of state laws, complex patent infringement issues, allegations of fraud on the Patent Office and the hurdle of proving that numerous patent infringement cases involving seven patents and nine generic manufacturers were not frivolous. Joint Decl. ¶¶ 55-57.

### 5. The risk of nonpayment.

This was an extremely complex case, which involved not only difficult legal issues, but also significant costs and the substantial risk of nonpayment. Hazard Decl. ¶¶ 8-9, 24. This meant that Class Counsel had to be prepared to front all the costs and carry all the risk that there might not be any recovery.

The risk faced by Class Counsel was multifaceted, as there was risk involved with: (a) the contingent nature of the case; (b) building a case from the ground up without a solid federal case for a foundation; (c) class certification; and (d) proving liability. Hazard Decl. ¶ 24.

### a. Risk is inherent to the contingent nature of the case.

A determination of a fair fee must include the undesirable characteristics (from Class Counsel's perspective) of a contingent antitrust action, including the fact that the risks of failure and nonpayment in antitrust cases are extremely high. "Plaintiffs' attorneys often invest millions of their own dollars, plus their billable time, based only on an anticipation of the likely fee award." Hazard Decl. ¶ 13. Numerous cases recognize that the attorneys' risk is "perhaps the foremost factor" in determining an appropriate fee award. *Goldberger v. Integrated Resources,*

*Inc.*, 209 F.3d 43, 54 (2d Cir. 2000) (citation and internal quotation omitted).  Unlike the highly skilled counsel representing GSK, Class Counsel get paid only if they win, and if they do get paid, it is often only after years of work with no payment.  "Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result."  *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981), *overruled on unrelated grounds by Int'l. Woodworkers of Am., AFL-CIO v. Champion Int'l. Corp.*, 790 F.2d 1174 (5th Cir. 1986).

Further, success before a jury in complex litigation is unpredictable, and this case is more complex than most.  As discussed above, from 1998 to the present, GSK has filed more than twenty patent infringement actions against nine generic drug manufacturers in three different district courts.  *See* discussion *infra* Section I, at 10-11.  Much of that litigation is still ongoing. Therefore, in order to succeed at trial, Class Counsel would face the daunting task of essentially having to litigate each patent infringement action within the antitrust class action trial.

Even if GSK's patents were found to be invalid in that litigation, that would not establish antitrust liability or damages.  To succeed at trial, Class Counsel would have to prove that GSK committed fraud on the Patent and Trademark Office.

Further, the theory of liability was complicated, involving GSK's use of sham litigation as part of its effort to keep generic versions of Paxil off the market.  This theory would entail educating the jury about the Food and Drug Administration and patent processes.

> **b.** **Class Counsel could not build their case upon a prior government action.**

As discussed above, many civil antitrust cases are built upon action by the federal authorities against the defendants.  *See supra*, Section 1, at 6.  Such was not the case here.  The government had initiated an action against GSK regarding Paxil, but dropped that matter without

further prosecution.  Therefore, Class Counsel had to build their case from scratch.  Hazard Decl.
¶ 9.

### c. There were real risks that the class would not be certified.

The risk of whether a class will be certified is an obvious risk in litigation of this type.
On October 4, 2001, Plaintiffs filed a motion for class certification pursuant to Rule 23.
Discovery on the issue of class certification continued for over a year and, while counsel worked
together to drive the process smoothly, discovery was hotly contested and required the Court's
guidance on at least half a dozen occasions.  GSK responded to Plaintiffs' motion on November
22, 2002, by filing, under seal, a multilateral attack on Plaintiffs' arguments for class
certification, taking particular aim at the affidavit of Plaintiffs' proffered expert.[15]  *See* GSK's
Memorandum in Opposition to Plaintiffs' Motion for Class Certification and GSK's Motion and
Memorandum of Law in Support of its Motion to Strike the Affidavit and Preclude the
Testimony of Plaintiffs' Proffered Expert, Docket Nos. 97 and 98.  Highly contentious issues
with regard to class certification included:

- *The adequacy of the Class Representatives.*  Defendant contended that the Class
  Representatives could not adequately represent the Class because, among other
  things, their purchase histories and types of payment for Paxil were not aligned
  with the Class and they only represented two of the nineteen states named in
  Count II of the Complaint as having state antitrust laws allowing recovery by
  indirect purchasers.

---

[15]    On January 29, 2003, after extensive briefing by the parties, the Court denied GSK's
Motion to Strike the Affidavit and Preclude the Testimony of Plaintiffs' Proffered Expert.
*Nichols v. SmithKline Beecham Corp,*, No. 00-6222, 2003 WL 302352, at *8 (E.D. Pa. Jan. 29,
2003).

- *The existence of classwide injury.*  Defendant strongly challenged Plaintiffs' expert, Dr. Gary French, on his analysis related to the ability to prove a classwide injury.  Questions arose on issues ranging from different types of payment schedules, to switching behaviors, to the criteria to be applied in creating a but-for world.  These culminated in a motion to preclude Dr. French's testimony, which was ultimately denied.

- *Predominance of common issues of law.*  Plaintiffs faced a difficult task of proving that common issues of law predominated in the subclass, which issues included the potential application of at least eighteen state laws and the law of the District of Columbia.  Defendants argued that each of those jurisdictions potentially had different standing laws for indirect purchasers, different requirements for liability (including, but not limited to, the inclusion of interstate activity), and different remedies available, including treble damages, attorney fees, and interest.  Similar issues arose with regard to state laws regarding unjust enrichment.

- *Applicability of Fed. R. Civ. P. 23(b)(2) for certification purposes.*  Defendant claimed that the monetary aspects of the relief requested predominated over the injunctive relief sought, making certification under Fed. R. Civ. P. 23(b)(2) inappropriate.

Reply and sur-reply briefing continued through January 2003, the Court held a hearing and considered oral argument on the class certification issue on February 12, 2003, and

supplemental briefing continued after the case returned to the active trial docket.[16]   While

Plaintiffs do not believe that the issues raised by GSK were insurmountable, the research and

briefing on these issues was complicated and extensive, and a favorable ruling was surely not

guaranteed.

> **d.      Difficult issues involving the proof of liability added risk.**

To successfully prosecute the claims in this case, Plaintiffs would have to demonstrate

that:

(1)      GSK intentionally misled the PTO into issuing the patents protecting Paxil;

(2)      GSK committed fraud on the PTO;

(3)      GSK used the illegally-obtained patents to prevent generic competition;

(4)      GSK used "sham litigation" to prevent generic competitors from going to market
         with generic versions of Paxil; and

(5)      GSK's conduct, even assuming it was improper, and not other factors (such as
         delay in the FDA approval process or the ability of generics to go to market
         immediately), actually delayed generic entry.

A patentee who brings an infringement suit may be subject to antitrust liability for the

anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves that the

asserted patent was obtained through knowing and willful fraud within the meaning of *Walker*

*Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172 (1965), or that the

infringement suit was "a mere sham to cover what is actually nothing more than an attempt to

interfere directly with the business relationships of a competitor." *Eastern R.R. Presidents*

---

[16]      At the request of the parties, to allow the *status quo* to be maintained during settlement
negotiations, this case was placed in the civil suspense file from March 14, 2003 until October
14, 2003.

*Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *California Motor Transp.*

*Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (holding that the philosophy expressed in

*Noerr* "governs the approach of citizens or groups of them . . . to courts, the third branch of

Government").  *See also Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.,*

*Inc.,* 508 U.S. 49, 62 n.6 (1993) (hereinafter "*PRE*") (declining to decide "whether and, if so, to

what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other

misrepresentations").

In *Walker Process,* the Supreme Court held that in order "to strip [a patentee] of its

exemption from the antitrust laws" because of its attempt to enforce its patent monopoly, an

antitrust plaintiff is first required to prove that the patentee "obtained the patent by knowingly

and willfully misrepresenting facts to the [PTO]."  *Walker Process,* 382 U.S. at 177.  The

plaintiff in the patent infringement suit must also have been aware of the fraud when bringing

suit.  *Id..*

Justice Harlan, in a concurring opinion, emphasized that to "achiev[e] a suitable

accommodation in this area between the differing policies of the patent and antitrust laws," a

distinction must be maintained between patents procured by "deliberate fraud" and those

rendered invalid or unenforceable for other reasons.  *Id.* at 179-80.  He stated that antitrust

liability does not arise simply because a patent has been invalidated:

> [T]o hold, as we do not, that private antitrust suits might also reach monopolies
> practiced under patents that for one reason or another may turn out to be voidable
> under one or more of the numerous technicalities attending the issuance of a
> patent, might well chill the disclosure of inventions through the obtaining of a
> patent because of fear of the vexations or punitive consequences of treble-damage
> suits.

*Id.* at 180.

34

The applicable law imposes a high burden on Plaintiffs to prove their antitrust claims under *Walker Process*.  To prevail on a *Walker Process* claim of fraudulent procurement, the claimant must show:

(1)     that the defendant knowingly and willfully made a fraudulent omission or misrepresentation;

(2)     with clear intent to deceive the patent examiner; and

(3)     "the misrepresentation or omission was the 'efficient, inducing, and proximate cause, or the determining ground' of the issuance of the patent *i.e.*, 'the patent would not have issued but for the misrepresentation or omission.'"

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 542 (D.N.J. 2000), *quoting Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070-71 (Fed. Cir. 1998).

As such, courts have held that a "finding of *Walker Process* fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct." *Nobelpharma*, 141 F.3d at 1070-71.[17]

Therefore, in order to prevail on their *Walker Process* theory, Plaintiffs would need to show by clear and convincing evidence that GSK knowingly and willfully made a fraudulent omission or misrepresentation with clear intent to deceive the patent examiner and that the misrepresentation or omission was the "efficient, inducing, and proximate cause or the determining ground" of the issuance of the patent.  *Id.* at 1070, *quoting Norton v. Curtiss*, 433

---

[17]     The issue of whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is now a question of Federal Circuit law. *Nobelpharma*, 141 F.3d at 1068.

F.2d 779, 794 (Cust. & Pat. App. 1970).  In defense of this claim, GSK would assert that the PTO reexamined the patents, without any involvement by GSK, and found them to be valid.

Additionally, Plaintiffs would need to show that GSK, knowing the patents at issue were procured by fraud, willingly sought to enforce those patents to an illegal end – here, to unlawfully extend its monopoly over Paxil.  *See, e.g., Walker Process,* 382 U.S. at 177.

Apart from the *Walker Process* claim, Plaintiffs also alleged that GSK pursued "sham litigation" against its generic competitors in order to prevent or delay generic Paxil from entering the market.  To prove "sham litigation," a plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury, rather than just to obtain a justifiable legal remedy.  *Nobelpharma*, 141 F.3d at 1071, *citing PRE*, 508 U.S. at 60-61.  The Supreme Court in *PRE* formulated a two-part test for this proof.  "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *PRE*, 508 U.S. at 60.  Second, a court may only examine a litigant's subjective motivation if the challenged litigation is objectively meritless.  *Id.*  This means a litigant must demonstrate that the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," *Noerr*, 365 U.S. at 144 (emphasis added), "through the 'use [of] the governmental *process* . . . as an anticompetitive weapon.'"  *PRE*, 508 U.S. at 60-61 (citations omitted).

Unlike in a *Walker Process* claim, a patentee's activities in procuring the patent are not necessarily at issue in a "sham litigation" claim.  The plaintiff instead must prove that the bringing of a lawsuit was subjectively and objectively baseless.  *Nobelpharma*, 141 F.3d at 1072.

As such, under *PRE*, "[n]either the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust

liability." *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998).  The law presumes that the assertion of a duly granted patent is done in good faith, and this presumption is defeated only by affirmative evidence of bad faith.  *Id.*

In this case, Plaintiffs faced two challenges under the "sham litigation" theory.  First, patent litigation over Paxil was ongoing.  Second, proving sham litigation would pose a significant obstacle because GSK survived summary judgment in several of the patent cases around the country.  Given this, Plaintiffs' ability to prevail under *PRE* presented a challenge.

In sum, Plaintiffs would have faced significant factual and legal hurdles before they would have been able to recover against GSK in this litigation.

### 6.    The amount of time devoted to the litigation.

This case required a substantial investment of time.  Counsel spent more than 17,000 hours preparing, litigating, and negotiating the settlement of this case.  "The amount of time incurred in this case demonstrates an extraordinary commitment of resources by Class Counsel" over the past four years.  Hazard Decl. ¶ 24.  For detailed discussions of the complexity of the litigation and the work that Class Counsel performed throughout it *see supra* Section I, at 5-13 and Section II.C.4, at 27-29.

Further, Class Counsel's commitment to this litigation is far from over.  Counsel will spend substantial time in the future preparing for and participating in the final approval hearing, handling claims administration, and potentially handling any appeals.  Class Counsel's fee request includes not only work that has been done to date, but also Counsel's future work on the case.  Class Counsel's lodestar calculations (discussed below), by contrast, do not include any amount for this substantial future work.

At the same time that Class Counsel have devoted significant time to this litigation, Counsel staffed this case leanly and appropriately.  When suitable, counsel assigned associate attorneys to the case, as well as paralegals, who have substantially lower hourly rates than named partners.  These staffing decisions demonstrate an appropriate allocation of resources.

### 7.      The consistency with fee awards in comparable cases.

It has become virtually routine for courts to use between 20% and 33 1/3% as the "benchmark" for a percentage fee award.  *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) ("common fund fees commonly range from 20% to 30% of the fund created, and . . . 25 percent has been a proper benchmark figure") (internal quotation and citation omitted); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001), *vacated and remanded on other grounds, In re Rite Aid Corp. Sec. Litig.,* No. 03-2914, 2005 WL 159464 (3d Cir. Jan. 26, 2005) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000) ("award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district"); *Strang v. JHM Mortgage Sec. Ltd. Partnership*, 890 F. Supp. 499, 503 (E.D. Va. 1995) (applying percentage of the fund to award 25%).  *See also* MANUAL FOR COMPLEX LITIGATION 4th § 14.121, at 188 (noting that 25% is a very common "benchmark" percentage that is presumptively correct); Hazard Decl. ¶ 24.

A sample of cases with settlements in the $25 million to $100 million range shows that the requested award of 30% is clearly within the range of the amount of fee awards in other cases:

| **Case** | **Settlement amount** | **Fee award as percentage of the settlement** |
|---|---|---|
| *In re Monosodium Glutamate Antitrust Litig.*, No. 00MDL1328PAM, 2003 WL 297276 (D. Minn. Feb. 6, 2003) | $81.4 million | 30.1% |
| *In re RJR Nabisco, Inc. Sec. Litig.*, MDL No. 818, 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) | $72.5 million | 25% |
| *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, slip op. (E.D. Pa. Oct. 13, 2004) (attached as Exhibit C.1) | $66.75 million | 32.3% |
| *Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Co. and American Bioscience, Inc.,* No. 1:01CV02313, Final Order and Judgment (D.D.C. Aug. 29, 2003) (attached as Exhibit C.6) | $65.8 million | 30% |
| *In re First Republic Bank Litig.*, No. CA3-88-0641-H (N.D. Tex. Feb. 28, 1992) *as cited in* Reagan W. Silber and Frank E. Goodrich, *Common Funds And Common Problems: Fee Objections And Class Counsel's Response,* 17 Rev. Litig. 525, 546 (1998) ("Silber") (attached as Exhibit D) | $58.2 million | 27.5% |
| *In re Wedtech Sec. Litig.*, 138 B.R. 5 (LBS) (S.D.N.Y. July 31, 1992) *as cited in* Silber, *supra* | $53 million | 33% |
| *Red Eagle Resources Corp., Inc. v. Baker Hughes, Inc.,* No. H-91-627 (S.D. Tex. 1994) *as cited in* Silber, *supra* | $52.5 million | 30.8% |
| *In re Workers' Compensation Ins. Antitrust Litig.*, 771 F. Supp. 284 (D. Minn. 1991) | $50 million | 22.5% |
| *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) | $42 million | 33.8% |
| *In re Medical X-Ray Film Antitrust Litig.,* No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) | $39.4 million | 33.3% |
| *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL Docket No. 1290 (D.D.C. June 16, 2003) (attached as Exhibit C.4). | $35 million | 30% |
| *In re Baan Co. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003) | $32.5 million | 28% |
| *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa. 1985) | $25 million | 23% |
| *In re U.S. Bioscience Sec. Litig.*, 155 F.R.D. 116 (E.D. Pa. 1994) | $15.25 million | 30% |

The percentage of the fund method is consistent with and intended to emulate what attorneys would receive if they negotiated fees privately with their clients. *In re Synthroid Marketing Litig.,* 264 F.3d 712, 718 (7th Cir. 2001) ("[W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); *Continental Illinois Sec. Litig.,* 962 F.2d 566, 572 (7th Cir. 1992) ("The object . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation."). Courts should thus look to the private market in assessing the reasonableness of a percentage fee. *In re RJR Nabisco, Inc. Sec. Litig.,* MDL No. 818, 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992) ("What should govern [fee] awards is . . . what the market pays in similar cases.").

A one-third contingency fee is generally standard in individual cases. *In re Copley Pharmaceutical,* 1 F. Supp. 2d 1407, 1412 (D. Wyo. 1998). The requested award is below this benchmark and comparable to awards in other pharmaceutical antitrust cases.

In some cases, it has been suggested that that when a settlement fund is substantial, it may be appropriate to consider reducing the fee award by using a "sliding scale" approach. *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 (3d Cir. 2001). Such an approach, however, is not mandatory. *In re Rite Aid,* 2005 WL 159464, at *5 ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund."). Further, the sliding scale approach has been criticized for penalizing attorneys who obtain substantial settlements, casting doubt on the standard methods by which courts ordinarily determine the propriety of fee awards, creating an inconsistent set of rules for determining fee awards, and

failing to account for the risks that counsel face in undertaking complex class action litigation. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 196 (E.D. Pa. 2000).

Ultimately, and importantly, the "declining percentage concept does not trump the fact-intensive [seven-factor] analysis." *In re Rite Aid,* 2005 WL 159464, at *5. Affording the proper weight to the seven *Gunter* factors, as set forth in this brief, there is no reason to apply the declining percentage approach in this case.

### E. A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.

The Third Circuit recommends that a lodestar cross-check is "sensible" to alert the court in the event that the percentage recovery is too great. *In re Rite Aid,* 2005 WL 159464, at *8. *See also O'Keefe v. Mercedes-Benz USA,* 214 F.R.D. 266, 310 (E.D. Pa. 2003), *citing Gunter,* 223 F.3d at 199 ("In common fund cases, such as this one, we have suggested that it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiffs' lawyers are not receiving an excessive fee at their clients' expense.").

When doing a lodestar calculation, it is often appropriate to use a multiplier "to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re Rite Aid,*2005 WL 159464, at *8, *citing First Task Force Report,* 108 F.R.D. at 243. The Third Circuit has recognized that multipliers in the range of one to four are frequently awarded in common fund cases. *In re Prudential,*148 F.3d at 341. The Third Circuit has also noted, however, that the multiplier "need not fall within any pre-defined range," and that the proper inquiry is whether the size of the multiplier is supported by the circumstances of the particular case. *In re Rite Aid,*2005 WL 159464, at *9. Thus, for example, a lower multiplier

would be more appropriate in a case lacking in legal and factual complexity, while a more complex case would support a higher multiplier. *In re Rite Aid,* 2005 WL 159464, at *6.

Class counsel's lodestar is $6,182,200.00, resulting in a multiplier of 3.15, which does not evidence an unreasonably high or low fee award in this case. It is higher, although not significantly, than the Third Circuit's suggested multiplier of 3 in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001), a case that the court found was lacking in legal and factual complexity. This case, by contrast, is both legally and factually complex, as discussed at length above, and a higher multiplier is thus reasonable.

Very recently, the Third Circuit has also cautioned that lodestar calculations should take into account the billing rates of all persons who worked on the case, not just senior partners, whose billing rates are highest. *In re Rite Aid,* 2005 WL 159464, at 9. Counsel in this case have not only complied with the requirements of *Rite Aid*, but have gone a step farther. Rather than submitting "blended" rates, which average the rates of all attorneys and paralegals who worked on the case, counsel have used the actual rates for each attorney and paralegal. Hazard Decl. ¶ 25. The fee request in this case is '[f]air in terms of the percentage requested and the hourly rate charged, while also being within the range of reasonableness in its proposed multiplier." Hazard Decl. ¶ 26.

## III.    A MODEST AWARD TO THE CLASS PLAINTIFFS IS APPROPRIATE.

"Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class. . . . In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (internal quotations and citation

omitted).  Class Counsel request payment of modest awards to the Consumer Class Plaintiffs in the amount of $2,500 each and to the Third-Party Payor Class Plaintiffs of $5,000 each.

The requested payments are in the same range as those awarded in other similar pharmaceutical class action cases.  *See, e.g., In re: Buspirone Antitrust Litig.*[18] ($1,000 to each of the consumer class representatives and $2,500 to each of the third party payor class representatives).

Without Class Plaintiffs, none of the Class members would have recovered anything. The Class Plaintiffs worked closely with Class Counsel in responding to discovery requests and consulted and communicated with Class Counsel throughout the investigation, prosecution, and settlement of the claims asserted in this litigation.

## IV.   REIMBURSEMENT OF LITIGATION AND SETTLEMENT EXPENSES FROM THE SETTLEMENT FUND IS APPROPRIATE.

Class Counsel request reimbursement of $546,480.79 in out-of-pocket expenses incurred through January 31, 2005.  *See* Exhibit E.  A large component of this amount consists of fees paid to experts and consultants who were instrumental in, among other things, helping Plaintiffs evaluate the case and Settlement.  Another significant part of the fees was attributable document scanning and coding and the document depository, all of which were necessary to manage the substantial number of documents involved in the litigation.  These expert and document expenses, as well as other expenses routinely charged to hourly-fee-paying clients, such as

---

[18]     *In re Buspirone Antitrust Litig.*, MDL No. 1413, Memorandum of Law in Support of Class Counsel's Joint Petition for Attorneys' Fees, Reimbursement of Expenses & Incentive Awards to the Named Plaintiffs, at 35 (S.D.N.Y. Oct. 24, 2003) (attached as Exhibit C.2) and *In re Buspirone Antitrust Litig.*, MDL No. 1413, Order No. 46 (S.D.N.Y. Nov. 14, 2003) (attached as Exhibit C.3).

copying charges, computerized legal research costs, and travel expenses, were reasonable and appropriate.

"[L]awyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax." *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999). *See also In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *4, *citing In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 852, 863 (W.D. Pa. 1995) ("Plaintiffs' counsel also are entitled to be reimbursed for all reasonable expenses necessary for the successful prosecution of this litigation."). The expenses advanced by Class Counsel were reasonable and necessary to the prosecution of this case and should therefore be reimbursed from the Settlement Fund.

## Conclusion

Without any guarantee of success or repayment, End Payor Class Counsel pursued this litigation at their own risk and expense. The reward should be commensurate with the risk and the result obtained. For the reasons set forth above, Class Counsel respectfully request that the Court approve the fee and expense application and enter an order awarding Class Counsel a fee award of 30% of the $65 million Settlement Fund plus accrued interest from the date of deposit of the funds at the same rate earned by the funds, and $546,480.79 in out-of-pocket expenses. Class Counsel also request that each Consumer Class Plaintiff be awarded $2,500 and each Third

Party Payor Class Plaintiff be awarded $5,000 for their assistance in the prosecution of this

action on behalf of the Class.


Dated:  February 1, 2005                    Respectfully Submitted:


                                            /s/ *Ellen Meriwether*
                                            **MILLER FAUCHER and CAFFERTY LLP**
                                            Ellen Meriwether, Esquire
                                            One Logan Square
                                            18th & Cherry Streets, Suite 1700
                                            Philadelphia, Pennsylvania 19103
                                            Phone: (215) 864-2800


                                            /s/ *Dianne M. Nast*
                                            **RODA NAST, P.C.**
                                            Dianne M. Nast, Esquire
                                            801 Estelle Drive
                                            Lancaster, Pennsylvania 17601
                                            Phone: (717) 892-3000

                                            /s/ *Kenneth A. Wexler*
                                            **THE WEXLER FIRM, LLP**
                                            Kenneth A. Wexler, Esquire
                                            One North LaSalle Street, Suite 2000
                                            Chicago, Illinois 60602
                                            Phone:  (312) 346-2222

                                            *Co-Lead Counsel for Plaintiffs and the End Payor*
                                            *Settlement Class*